[Civil No. 2140.    Filed February 2, 1925.]

[232 Pac. 880.],

## DAVIES & VINCENT, a Copartnership, Appellant, v. BANK OF COMMERCE, a Corporation, Appellee.

1. BANKS AND BANKING—RECEIPT OF DRAFT FROM DEPOSITOR PRIMA FACIE SALE OF DRAFT BY DEPOSITOR TO BANK.—*Prima facie* a draft, when received by a bank from a depositor, being credited by it to him as so much cash, becomes its property, and it becomes liable to him for so much money as of the date of credit.

2. BANKS AND BANKING—TRANSACTION PRIMA FACIE SALE OF DRAFT BY DEPOSITOR TO BANK MAY, AS BETWEEN THEM, BE SHOWN DEPOSIT FOR COLLECTION.—Though *prima facie* a transaction is a sale of a draft to a bank by a depositor, it may be shown, as between them, that it was merely received for collection, with permit, as matter of favor and convenience, to draw against it before payment.

3. BANKS AND BANKING—FINDING THAT DRAFT WAS RECEIVED BY BANK FOR COLLECTION SUPPORTED BY EVIDENCE. — Evidence *held* sufficient to support finding that draft was received by bank merely for collection for depositor, though he was allowed to draw against it at once as accommodation.

4. APPEAL AND ERROR—EVIDENCE NOT WEIGHED NOR FINDINGS DISTURBED, WHERE IT REASONABLY SUPPORTS JUDGMENT.—Appellate court will not weigh the evidence nor disturb the findings, where it reasonably supports the judgment.

5. BILLS AND NOTES—PROVISION FOR PROTEST OF FOREIGN BILL LIMITED TO WHERE HOLDER AND DRAWER ARE DIFFERENT.—Provision of Civil Code of 1913, paragraph 4297, that, if foreign bill is not so protested, drawer and indorsers are discharged, has reference only to a case where holder and drawer are different persons, and not where draft is received by bank from depositor drawer ·for collection merely.

6. BANKS AND BANKING—LIABILITY FOR FAILURE TO PROTEST DRAFT FOR NONPAYMENT UNENFORCEABLE IN ACTION FOR BREACH OF DUTY TO DEPOSITOR BY FAILURE TO PAY CHECK.—Any liability for damages from failure of bank to protest for nonpayment drafts which

1.  See 3 R. C. L. 523.    2.  See 3 R. C. L. 524.

it received for collection from a depositor, the drawer thereof, is not enforceable under his complaint based on its breach of duty to him as depositor by refusal to pay his checks.

See (1) 7 C. J., p. 635. (2) 7 C. J., p. 635 (1926 Anno.). (3) 7 C. J., p. 669. (4) 4 C. J., p. 879. (5) 8 C. J., 624 (1926 Anno.). (6) 7 C. J., p. 668 (1926 Anno.).

APPEAL from a judgment of the Superior Court of the County of Cochise. W. R. Chambers, Judge. Affirmed.

Mr. David Benshimol, for Appellants.

Mr. Alexander Murry and Mr. Frank E. Thomas, for Appellee.

ROSS, J.—Davies & Vincent, a copartnership, brought this suit against the Bank of Commerce for a balance, claimed to be due from bank, but which it is alleged the bank refused to pay out upon plaintiff's checks; that is, the count was one for money had and received. The defendant's answer consists of a general denial, and the assertion that the claimed credit was only apparent, and not real in this, that defendant had accepted from plaintiffs certain drafts for collection with which it had credited plaintiffs on its books, under an agreement that plaintiffs might check against such credits, but would and should make good any amount drawn against credit, if drafts were not honored and paid by the drawee thereof; that the claimed balance was the sum credited upon defendant's books to plaintiffs for drafts which the drawee had failed to pay and which had been dishonored. The defendant also cross-complained and alleged that, after debiting plaintiffs' account with dishonored drafts, the plaintiffs were indebted to it in the sum of $2,134.40, and prayed judgment. The plaintiffs replied to the cross-complaint, setting up that the transaction was a sale by

the plaintiffs to defendant of such drafts, and that the money paid therefor was an absolute and unconditional credit to the plaintiffs.

Upon the issues thus made out, the parties went to trial before the court, without a jury, which resulted in a judgment dismissing the plaintiffs' complaint, and granting affirmative relief in favor of the defendant as prayed for in the cross-complaint. The appeal is from the judgment and from the order overruling plaintiffs' motion for a new trial.

The assignments are directed at the sufficiency of the evidence to support the judgment, and for that reason we will make a statement of the evidence as we find it.

The plaintiffs, by pass-book, original ledger entries and statements, proved the credit sued for. Davies, a witness on behalf of plaintiffs, after identifying the above evidence, was cross-examined by defendant, and from him and other witnesses a history of the dealings culminating in this lawsuit was given. In 1919 one William Jessen, of El Paso, Texas, had a contract with the United States government to furnish it, delivered at El Paso, a large quantity of hard wood. On July 22, 1919, Jessen contracted to buy from the plaintiffs, and they to sell to him, 12,500 cords of hard wood, at $8.50 per cord, f. o. b. cars at Douglas payable seventy-five per cent on demand, drafts and balance after inspection by the government. The plaintiffs obtained the wood in the Republic of Mexico, and from there it was shipped through Douglas, Arizona, to El Paso, Texas, where it was to be accepted and paid for by the government. The immediate needs of plaintiff for cash made it necessary that arrangements be made to cash demand drafts as soon as the wood arrived in Douglas, on the American side. This was satisfactorily arranged for with the Bank of Douglas originally, and from August 4, 1919, until No-

vember 10th the plaintiffs' sight-drafts were taken care of by such bank, so that plaintiffs had cash available in Douglas to carry on their contract. November 10th this account, upon the suggestion of Jessen, was transferred to the defendant bank, and on that date Jessen opened the account by depositing $1,000 to the credit of Davies & Vincent. At the time Jessen was accompanied by Hal Christie, of El Paso, who was an officer and director of defendant, and also connected with the El Paso National Bank. Thereafter the business was carried on with the defendant bank in this manner: When a shipment of wood arrived in Douglas, Arizona, plaintiffs would obtain bills of lading from the carrier and attach these to a draft against Jessen at El Paso, Texas, in care of the American Trust & Savings Bank, in favor of defendant, and present draft to defendant at its banking house, whereupon defendant would enter the face of draft on plaintiffs' passbook and in its own books as cash. The defendant, in turn, would charge draft to the First National Bank, of El Paso, indorse it "to the order of any bank or banker," and then send it to its correspondent, the First National Bank of El Paso, for collection. When collected, the latter bank would so report and receive credit upon defendant's books for the amount.

A. S. McKinnon, vice-president and cashier of the defendant, testifying in behalf of defendant, in answering the question as to what conversation was had between him, Christie, Jessen and Davies, at the time arrangements were made for the bank's handling this account, said:

"Well, it was about as I said a while ago. They wanted to open this account with us so they could check against this money, and we agreed to take these drafts and give them credit for them, subject to final payment; that is, if the drafts for any rea-

son were not paid, they would be charged back to Davies & Vincent again.''

Davies denied that there was any such agreement, and says McKinnon said to him:

'' 'Mr. Davies, bring your drafts here and we will take them.' That is all there was to it.''

He further said he thought he was selling drafts outright to bank.

The wood was shipped on an open account, so that Jessen could take it from the carrier without paying draft. There are four drafts involved in this controversy, all of which were made out and handled in the manner above described. The first is dated June 4th for $2,470.97; the second June 8th for $921.28; the third June 14th for $3,088.72; the fourth and last July 2d for $1,660.90. Why the drafts of June 5th, 8th and 14th were not paid by Jessen the evidence does not satisfactorily explain. It is not shown except by inference that he ever collected from the government the sums covered by such drafts. Davies, who was actively in charge of the business end of the contract, was in Mexico on June 8th, 14th and 26th, and the drafts of those dates were drawn, signed and turned over to defendant by one Baird, acting as plaintiffs' employee or agent. It was about June 20th before defendant or plaintiffs learned these drafts had not been taken up by Jessen, and just how they learned this is not definitely shown. Stanley W. Coon, who was assistant cashier of the defendant, says the fact that drafts were not paid was called to his attention June 20th, and that about that time he spoke to Mr. Baird concerning it, stating Jessen was very slow taking up drafts, and that Baird told him Jessen was having trouble getting his money out of the government, but that he would settle as he received payments from the government. Baird was a witness, and did

not deny he had information as stated by Coon.
With knowledge that the items of June 5th, 8th and
14th had not been cared for, on June 26th a ship-
ment coming to $4,181.84 was made, and draft there-
for was paid. Also the shipment of July 2d was
sent forward with such knowledge.

Davies, according to his testimony, was in El Paso
July 13th to get a settlement with Jessen for the
twenty-five per cent and five per cent held out on
wood deliveries, and while there was told by Christie
one draft was unpaid. He returned to El Paso after
July 20th and went to the quartermaster and found
out the government had not paid the draft of July
2d. Thereupon he employed attorneys, and through
them collected this draft. This collection, less $300
paid attorneys by Davies, was brought by him to
Douglas and paid over to defendant. On July 28th
the drafts of June 5th, 8th and 14th were debited
to plaintiffs' account; Jessen not having paid them.
It also appears in evidence that the plaintiffs brought
suit in the county of El Paso, Texas, against Jessen
for the amounts covered by unpaid drafts, together
with other indebtedness, and recovered judgment for
said sums.

It is the contention of plaintiffs that the weight
of the evidence shows that drafts with bills of lad-
ing attached were the property of defendant, and, of
course, the converse, that the money credited to
them on pass-book and in the books of the defend-
ant was their property.

We think the general rule of law is that checks,
drafts and other evidences of debt received by a
bank and credited as so much money become the
property of the bank, and the bank becomes liable
to the depositor for so much money as of the date
of credit. "*Prima facie* the passing to the credit
of a depositor of a check drawn in favor of the
bank, not indicating that it was deposited merely

for collection, passes the title to the bank. 2 Morse on Banking, § 569 et seq. This general rule will yield to the intention of the parties as reflected in the transaction." *National Bank* v. *Everett,* 136 Ga. 372, 71 S. E. 660.

In other words, as between the immediate parties to the transaction, the actual agreement may be shown. Paragraph 4161, Civil Code of 1913 (the same being section 16 of the Uniform Negotiable Instruments Act), provides that any negotiable instrument which has not come into the hands of a holder in due course may be shown to have been conditional, for a special purpose only, and not made to transfer property in the instrument, and that this may be shown by parol evidence is abundantly supported by the cases. *Morris-Miller* v. *Von Pressentin,* 63 Wash. 74, 114 Pac. 913. See, also, Uniform Laws Annotated, vol. 5 (Negotiable Instruments), p. 83, for cases in point. So the fact that a bank accepts a draft as cash, and permits the depositor to check against it is not conclusive evidence that the bank becomes the owner of, or intended to buy, the draft, or that the depositor becomes the owner of the cash so credited to him. In 3 R. C. L. 523, section 151, is this statement of the law:

"The bank may permit, as matter of favor and convenience, checks to be drawn against it before payment; the depositor, in the event of nonpayment, being responsible for the sums drawn, not by reason of his indorsement, the check not having ceased to be his property, but for money paid."

This, in a nutshell, is what the defendant contends was the arrangement with plaintiffs; that is, it would take plaintiffs' drafts on Jessen and credit plaintiffs with full face value, with an agreement that, should drafts for any reason be not paid, they

would be charged back to plaintiffs. And plaintiffs do not dispute that such an arrangement might be legally made; they only say the weight of the evidence fails to support such a contention.

There is a conflict of evidence upon this issue. McKinnon and Davies, the only witnesses to the starting of the business relation between plaintiffs and defendant, and as to what was said and agreed to at that time, flatly contradict each other. If Davies' version of what took place is believed, the officers of the defendant bank agreed to buy the paper of Davies & Vincent outright and assume all the risk of collecting such paper from Jessen. If McKinnon's statement be accepted as correct, the bank agreed to take drafts for collection and, pending such collection, to accommodate plaintiffs by extending to them credit to carry on their wood contract. The learned trial judge, whose duty it was to weigh these divergent statements, arrived at the conclusion that it was not intended that defendant should become the owner of drafts nor plaintiff the owner of funds checked against, but rather, that the relation of plaintiffs and defendant was that of principal and agent, and the checking privilege a gratuitous accommodation. Some acts of Davies, after he learned drafts were not being honored promptly, are worthy of consideration, in connection with the conflict of testimony, as showing his construction of the agreement as to the manner of handling such paper. His conduct in employing attorneys to collect the draft of July 2d was conduct incident to ownership, and finds a reasonable explanation when regarded as an effort to protect his firm against the dishonored draft. Conduct of more pronounced proprietorship could hardly be imagined than that of bringing suit against Jessen for the very sums covered by the dishonored drafts and

successfully prosecuting the same to judgment, as was done by plaintiffs in the Texas courts.

We recognize that the question, as to whether drafts were conditional and not made to transfer property, upon conflicting evidence, is one for the trial judge, or jury, when one is called. *Merchants' Nat. Bank* v. *Marden*, 234 Mass. 161, 125 N. E. 384; *Niblock* v. *Sprague*, 200 N. Y. 390, 93 N. E. 1105. And our purpose in setting out the evidence, and some of the inferences to be drawn therefrom, is not to weigh it, but to show that it not only supports the court's conclusion but is ample to sustain any burden cast upon defendant because of the manner of handling drafts and extending credit. Under the rule we have uniformly followed, we will not weigh the evidence nor disturb the findings of the trial court where there is evidence reasonably supporting the judgment, and we must therefore take the defendant's theory of the case on this issue as established.

The plaintiffs take the position, however, that even though defendant's contention (that it accepted drafts for collection and not as purchaser) be sustained, still, before defendant would have a right to debit plaintiffs' account with dishonored drafts, and to judgment for any balance allowed as overdrafts, the defendant should show by its pleadings and proof that it discharged its duty of presenting drafts to drawee for acceptance and payment, and took the other legal steps necessary under the law merchant or Negotiable Instruments Act to hold a drawer.

Plaintiffs direct attention to paragraph 4297 of the Civil Code (being the same as section 152, Negotiable Instruments Act), and say, because the draft in question was a foreign bill, it was necessary in order to hold them that it be protested for nonpayment. The particular words relied upon are: "If it

(a foreign bill) is not so protested, the drawer and indorser are discharged.'' This language has reference to a case where the holder of a foreign bill and the drawer thereof are different persons, in which case the holder, failing to have bill protested for nonpayment, would lose his right of recourse against the drawer; but, where, as is the case here, the holder and drawer (plaintiffs) are one and the same person, it would be an idle and a foolish thing to require that it be protested. Daniel on Negotiable Instruments (5th ed.), section 927, says:

"The requisition of a protest in the case of foreign bills was in order to afford authentic and satisfactory evidence of due dishonor to the drawer, who, from his residence abroad, would experience a difficulty in making proper inquiries on the subject, and be compelled to rely on the representations of the holder.''

It may be in a proper form of action, if the evidence should show that the defendant, or its correspondent, the First National Bank, of El Paso, through neglect to protest draft for nonpayment caused the loss thereof to the plaintiffs, a recovery might be had. Such was not the issue in this case. The plaintiffs sued upon the contract the law implies every banker enters into with his depositor to keep and hold the latter's funds for his use and benefit, and to pay them out on the depositor's orders, alleging the breach of such contract, in that defendant had refused to pay plaintiffs' checks. Clearly, under such a complaint, plaintiffs could not recover damages from their agent to collect drafts for neglect in failing to protest such instruments for nonpayment.

The judgment of the lower court is affirmed.

McALISTER, C. J., and LOCKWOOD, J., concur.